## THE WHEELER–SHIPYARD HULL NO. 304.

### In re WHEELER et al.

District Court, E. D. New York.
July 25, 1932.

See, also, 51 F. (2d) 374.

Crowell & Rouse, of New York City (E. Curtis Rouse, of New York City, of counsel), for petitioners.

Bigham, Englar, Jones & Houston, of New York City, and Bond, Schoeneck & King, of Syracuse, N. Y. (Chester B. Rifenbary, Clarence R. King, and Hubert C. Stratton, all of Syracuse, N. Y., of counsel), for claimants.

BYERS, District Judge.

In this proceeding, the petitioners seek exemption from or limitation of liability for the result of an explosion which occurred on a motor-boat built and owned by them, on May 24, 1930.

The motor-boat was known as Hull No. 304, and had been exhibited at the motor-boat show of 1930 in the City of New York, and thereafter had been demonstrated for the purpose of sale, in and around the waters of New York Harbor adjacent to the shipyard of the petitioners on Coney Island creek at the foot of Cropsey avenue, Brooklyn, within this district.

On May 6, 1930, the boat was put in condition to proceed under its own power to Lake Cayuga. Two employees of the petitioners took it up the Hudson to Albany, where delivery was made to the claimant Brown, who was a sales agent of the petitioners, having his headquarters in Syracuse. Mr. Brown had conceived the idea of having it on exhibition on Lake Cayuga in connection with the spring regatta of Cornell University.

Mr. Brown took this particular boat and another one also built by the petitioners in charge, and proceeded to Brewerton, where demonstrations were conducted, and on May 20th departure was had for Ithaca, which was reached on May 22nd. On that and the following night, Brown and his wife and two other guests slept on board, and on Saturday morning, the 24th, Brown took both craft to the Ithaca inlet at the foot of the Buffalo street bridge, to take on gas for the purpose of the day's activities.

This boat was about 40 feet over-all, but the beam and draft do not appear in the record. She was a twin screw motor gasoline launch, having cabins fore and aft, which were separated by a bridge deck a little aft of amidships. The level of the cabins was a few feet lower than that of the bridge deck space, which contained the motors under its flooring. The steering wheel was in this space, on the forward port side, and adjacent was the instrument panel.

As stated, the motive power was supplied by twin motors connected with twin screws.

The forward and after cabins were roofed in the customary manner, as was the bridge deck space.

The gasoline tanks were on the port and starboard sides, partly in the space occupied by the motors, and the port gas tank projected into the after cabin space at the base of the closet on that side of the boat, so that the floor of the latter was a raised platform.

When gasoline was taken on the morning of May 24th, the port tank was filled from a hose connected to a tank wagon on the shore.

The method of filling the off-shore or starboard tank is not clearly shown. Brown testified on the trial that this was also done by hose, an extra section having been coupled to the hose as used for filling the port tank, which permitted the nozzle to be placed directly in contact with the filler pipe of the starboard tank. He had previously stated that this latter operation was accomplished through the use of five-gallon cans which were filled from the hose leading to the tank wagon, and then emptied by him into the starboard filler pipe through a funnel provided for that purpose.

It is unnecessary to make a finding on that subject but it is referred to because there is a possibility that the operation was conducted in the latter manner, whereby fumes may have gathered.

The weather conditions were unfavorable at the time; that is to say, it had been raining and it was foggy, and the air was heavy. There is a conflict of testimony as to whether any curtains were hanging from the open sides of the bridge deck at the time in question.

After the filling had been completed, one of the engines was started by Brown, and then he pressed the button for the other, and immediately an explosion followed, which blew out the stern of the motor-boat and completely wrecked the entire after cabin, and did such injury to the occupants that actions to recover damages in a substantial amount were brought, and these cases have resulted in the institution of the pending proceeding.

The evidence discloses that, in addition to the customary vents for admitting air to the bilge spaces, there was connected through the lazarette in the stern, by a copper pipe having a diameter of $4\frac{1}{2}$ inches, a blower or electric fan, the purpose of which was to exhaust the air and fumes in the bilge and thereby supply a circulation from the vents above referred to; this was in operation at the time in question.

Further it appears that Brown had opened the hatches in the floor of the bridge deck space, apparently for the purpose of admitting fresh air to the bilges, and had delayed starting the motors for a period of at least ten minutes after the filling operation had been completed, which would seem to have been a sufficient time to insure the dispersion of gasoline vapors.

The testimony for the petitioners developed only one untoward incident in the history of this craft from the time it was put

into the water, on February 10th, until departure was had for Albany, on May 6th, namely, a fire in the bridge deck space on the afternoon of the latter day. This was explained by the mechanic whose duty it was to finally test the equipment, as having been caused by the fact that, to remove from the exterior of the engines an accumulation of rust and dirt, he used gasoline which he obtained from a pump in the petitioners' yard; the fumes therefrom became ignited when he started one of the motors by short-circuiting the starting device by using his pliers instead of the starting switch. He put that fire out within three or four minutes, although he did not use the Lux fire extinguishing system on the boat, but a Pyrene gun with which he was more familiar.

That fire burned the insulation on some of the wiring immediately adjacent to the motors, and also scorched what was called the after bulkhead in the engine-room or bridge deck space. The scorching was in part obliterated by a painter, and new portions of wire were inserted to take the place of that section on which the lead cable had melted as the result of the fire. This fire did not render the launch unseaworthy.

This witness, Moran by name, had previously attributed the cause of this fire to a loose filler pipe in one of the tanks, during the course of an interview with a representative of the claimants' attorneys. He stated on the trial that he had given that untrue version because he did not wish to admit that he had violated a rule of the petitioners' yard in washing the engines with gasoline, for fear that he might be discharged if that fact became known. This, of course, was a shortsighted view to take, because he would have been just as responsible for passing a loose filler pipe in either tank as he would be for breaking the rule referred to. Observation of this witness creates the impression that he told the truth on the trial as to the cause of the fire; at the same time, his demonstrated facility in manipulating facts, where his own interests seem to be involved, would preclude reaching a conclusion based upon his testimony alone, concerning the condition of the launch in general.

On the way to Albany, minor accidents happened, not connected with the fuel supply, which required repairs at Watervliet, about six miles above Albany, namely, a new shaft and the straightening of struts rendered necessary because of striking a submerged object. Also certain of the wiring was repaired which showed the effects of the fire in the yard.

Between Watervliet and Brewerton a knock developed in one of the motors, which also required attention before departure was had for Ithaca.

At Albany or Watervliet, the bilges were examined by Brown, and his testimony is that shavings were found therein which were water-soaked, due to the presence of a certain amount of water in the bilges, and probably some gasoline. These were removed by Brown.

The after cabin was slept in by Brown between Watervliet and Brewerton, and again by members of his party on the two nights prior to the explosion, and no one complained of gas fumes in the cabin.

The boat sank immediately after the accident at Ithaca, and during that day, Saturday, May 24th, the hull was recovered, and placed on land. The condition of the wreck was not changed until the following Wednesday or Thursday, during which interval a survey was held for insurance purposes. Demolition began on Wednesday or Thursday, and, in the course of that operation, the port gas tank was exposed to view; that is to say, the engine-room or bridge deck flooring was removed, and the beam supporting the aft engine-room bulkhead was taken out, as was all construction covering the top of the port gas tank, and then there was discovered in the top of that tank an open hole having a diameter of about $\frac{3}{4}$ of an inch, and, surrounding the hole, there was either solder or the remains of a collar; it is impossible to find from the testimony the exact nature of this remaining fragment of a prior existing connection, but such there was.

Nor is it possible to make a precise finding as to the number of apertures in the top of that tank. There can be no doubt that prior to the explosion there was a vent pipe in the top of the tank, which led outboard; there was also a filler pipe, connected with a hole in the top of the tank, and there was also a hole connected with a gauge which registered on the instrument panel alongside of the steering wheel, showing the amount of gas in the tanks; but as to whether this connection was made to a hole in the top of the tank or in the front end of the tank near the top, the evidence is not clear.

In order to remove the flooring and wooden structure at the top of the tank, it was necessary to disengage the connections, whether there were two or three, and this was done before the flooring was taken up; that is to say, the filler pipe was removed with a

Stillson wrench, but how the other connections were removed, is not established with any degree of clarity.

Whether the hole above referred to had contained the filler pipe or not, cannot be ascertained, and the only witness who ought to have known, when he saw this hole, exactly what it was, namely, Eugene Wheeler, said that he did not know.

This tank was not available at the time of the trial, because both of the gas tanks, having been removed from the hull of the wreck, were thrown overside and almost immediately sold to a junk dealer, and by him carried away. The conduct of Eugene Wheeler at this time was either extremely adroit or extremely maladroit. Both of these tanks contained gasoline at the time that the wrecking operations were proceeding, and it is undisputed that he took an ax and opened the tanks in order that the gasoline might drain therefrom; he says he split the sides at the top for this purpose, but did not demolish the top. Three witnesses contradict him on this issue; one, the witness Brown, who is manifestly interested in the outcome of this proceeding, and Middaugh and Wahl, who were workmen engaged in the task of wrecking the hull; all of these say that Eugene Wheeler took an ax and delivered one or more blows directly on the top of the gas tank, at the place occupied by the hole, in an apparent effort to demolish the tank in such a way that the presence of the hole could not afterwards be observed. That which he did with reference to the port tank, he duplicated almost immediately with reference to the starboard tank. The latter action was as consistent with a studied effort to treat both tanks in the same way and thereby disguise a purpose of obliteration as to the port tank, as with an ingenuous intent merely to permit the gas in both tanks to escape so that the tanks could be lifted out of the hull.

Nor is Eugene Wheeler's desire to turn these copper tanks into cash easily to be understood, for the parts of the wrecked vessel which were deemed worthy of saving were put into a motor truck and sent to the Wheeler yard; and why these two copper tanks, between six and seven feet long and of a capacity of 100 gallons, should not have been retained, is not apparent.

On the other hand, no one asserts that the junkman was present as the result of any prearrangement with Wheeler, and it may be that this purely fortuitous circumstance suggested an easy way of realizing some cash reclamation at the time.

Viewed as a whole, Eugene Wheeler's contribution to this incident, however studied or however lacking in purpose it may have been, cannot be viewed as the determining factor in this cause. The most unfavorable aspect of his conduct is, that, upon finding the open hole in the tank, he thought it was significant and should be done away with. But that does not prove that he was right.

The claimants assert and ask the court to find, that the hole in the top of this tank had remained open from the time that the tank was installed in the boat, and that it permitted the escape into the bilges of such an accumulation of gasoline and/or fumes, that the explosion which took place on May 24th can be inevitably traced to that cause and that cause alone; and that this was such a negligent act on the part of the builders as to constitute them liable for the results of the explosion, and that the damages and loss arising from the transaction were necessarily incurred with the privity and knowledge of the owners, whereby limitation may not be had.

This argument is not supported by the evidence.

The court is asked to find that the port gas tank was shifted some distance astern from the position it was intended to occupy, by reason of certain requirements in connection with the operation of the twin motors; that this brought one of the apertures in the top of the tank directly under the beam supporting the after engine-room bulkhead, and consequently the connection thereto had to be removed; and that the top of the tank was so close to the said beam that, in its new position, no one noticed the open hole, and therefore took no means to close it. This is purely conjecture, and it is not thought to be rational.

There is no evidence to support the contention that the position of the tank was shifted after the initial installation, and there is evidence to the contrary; more important, there is no evidence of the cutting of a new hole in the top of the tank, which would have been the obvious requirement if a fitting already in place had to be removed by reason of the proximity of the beam in question. Such a hole could not have been cut in the top of the tank without removing the latter from the hull of the vessel, and, if this had been done, which has not been shown, the credulity of the court would be stressed to the breaking point by any contention that an experienced builder of motor-boats would replace a tank such as this, leaving an open hole from which a fitting had been removed.

It will be recalled that this boat was in the water and in almost constant operation during the period beginning on or about the 10th of February and continuing until May 6th. If gasoline and fumes had been escaping from a hole in the gas tank during all of that period, it is believed that they would have been present in such volume in the bilges that safe operation could not have continued; certainly, if they had been present on the occasion of the fire above referred to, on the afternoon of May 6th, the latter, which Moran says was in the bilge of the vessel, would have caused an ignition of such fumes, and the fire could not have been confined as it was.

For these reasons, the claimants' theory cannot be accepted, because it is not supported by the evidence nor the reasonable probabilities deducible therefrom.

It must be apparent that these petitioners had more than the ordinary interest of an owner at stake in the performance of this craft. It was their business to sell motor-boats, and the trip in question was projected as part of their sales effort.

The expert testimony in the case is interesting, but points to no inevitable conclusion, except to create in the mind of the court the impression that, if there had been an open hole in the top of this gasoline tank from the time of the boat's operation until the day of its destruction, that fact would have become manifest almost as soon as she began to ply the waters of New York Harbor as a demonstrator model.

It results that the cause of the explosion has not been traced to any act or omission on the part of the petitioners.

The claimants cite The Columbia (D. C.) 25 F.(2d) 516, as authority for the proposition that the doctrine of res ipsa loquitur applies. The basis of the finding to that effect in that case was that the testimony established that there was air in the gas bag from which the illuminating gas in question was taken, and that the explosion might result from the presence of the air, if the flame travelled back into the bag, and that this factor might have been avoided if the gas bag had been purged of air.

All that is known in this case is that an explosion did occur, and the only explanation of it is that gasoline fumes accumulated within the boat, which were ignited when the second motor was put into operation. It cannot be deemed to have been established by the claimants that the hole in the top of the port gas tank was responsible for this condition, because the presence of that open hole, when discovered, was as consistent with something that occurred during the wrecking operation or as a result of the explosion itself, as it was with anything that existed prior to that time.

For reasons that it has been the effort herein to make clear, it is concluded that there was no open hole in the top of the port gasoline tank prior to the time of the explosion, which means that there has been no proof of unseaworthiness of this motor-boat when it left the petitioners' yard.

The claimants also urge that more than one fire is shown to have occurred on this craft in the petitioners' yard prior to or on May 6th, but the evidence does not sustain that conclusion.

The argument against the jurisdiction of this court has been foreclosed by the decision of Judge Campbell, in Petition of Wheeler (D. C.) 51 F.(2d) 374.

No liability on the part of the petitioners having been shown, they may take a decree in exoneration, with costs.

Settle decree on notice.

If findings are desired, they may be settled at the same time, and should embody appropriate recitals as to ownership and incorporation.