Robert B. **YOUNG**, Plaintiff,

v.

**CLEAR LAKE YACHT BASIN, INC.,**
et al., Defendants,

Utica Mutual Insurance Company et al.,
Intervenors.

Civ. A. No. 68–H–489.

United States District Court,
S. D. Texas,
Houston Division.

Jan. 19, 1972.

Warner F. Brock, Brock & Williams, Houston, Tex., for plaintiff.

L. Glen Kratochvil, Schirmeyer & Kratochvil, Houston, Tex., for defendant Clear Lake Yacht Basin.

James E. Ross, Ross, Griggs & Harrison, Houston, Tex., for defendants Security Insurance Co. of New Haven and Captain Jack Roberts and Jack Young.

William E. Hall, Jr., and Everett L. Anschutz, Jr., Houston, Tex., for defendant Young Furniture Manufacturing Co., Inc.

Jonathan Day, Butler, Binion, Rice, Cook & Knapp, Houston, Tex., for intervenors Michigan Millers Mutual Insurance Co. and All Risk Insurance Agency.

A. J. Watkins, and John Lee, Watkins & Hamilton, Houston, Tex., for intervenor Utica Mutual Ins. Co.

CARL O. BUE, Jr., District Judge.

## MEMORANDUM AND ORDER

Early in 1966, a single engine, twenty-six foot Chris-Craft Sedan Cruiser, model 1948, was purchased with funds supplied by Young Furniture Manufacturing Company, Inc. [hereinafter the Company], and title was taken in the name of Jack Young, an executive officer of the Company and brother of the plaintiff. The actual ownership of the vessel is disputed. On April 16 of that year a Houston independent marine surveyor, Captain Jack Roberts, made a survey of the yacht TOPAZ, and shortly thereafter Clear Lake Yacht Basin, Inc. [hereinafter Clear Lake] was engaged to make certain repairs on the vessel, some of which were upon the recommendation of Surveyor Roberts. Prior to and contemporaneously with the execution of the commissioned work by Clear Lake, certain officers and employees of the Company, including the Young brothers, engaged in repair work aboard the TOPAZ, a major portion of which work was painting, replacing brightwork, upholstering and other cosmetic repairs. After Clear Lake completed its repairs on or about May 7, 1966, Surveyor Roberts certified that the repairs had been performed satisfactorily on the eighteen year old pleasure craft. Security Insurance Co. thereupon issued its policy Y 118 126 to Jack Young on the TOPAZ, providing protection and indemnity insurance for bodily injury for one person in the amount of $50,000. The Young brothers and Young Furniture Company paid for the repairs, and all work done on the vessel was accepted. The TOPAZ was then used for pleasure and business purposes on several occasions by the Young brothers over a period of approximately one month prior to the casualty.

On June 9, 1966, an explosion and fire occurred on the TOPAZ, seriously injuring the plaintiff, Robert Young, who was the only person aboard at the time.

It is this event which culminated in the suit now before the Court. Plaintiff has alleged numerous derelictions of the defendants including counts of negligence and breaches of warranty to furnish a seaworthy vessel. These breaches and the potential liabilities therefor will necessarily be explored in depth, infra, as will the alleged contributory negligence of plaintiff. The Court's initial inquiries, however, must be directed toward the explosion [1] itself, its nature, intensity, and proximate cause.

## I.

## CIRCUMSTANCES LEADING UP TO THE EXPLOSION

After Surveyor Roberts completed his condition and valuation survey of the yacht TOPAZ and made certain written recommendations as to repairs necessary for the obtaining of insurance coverage,[2] the Youngs engaged Clear Lake to accomplish this work on the yacht. The TOPAZ was hauled out at the Clear Lake yard for about two weeks commencing in late April and terminating approximately May 7, 1966. Clear Lake's employees completed the recommended repairs which were subsequently approved by Surveyor Roberts, and in addition, they performed separate repairs to the hull which were requested by the Youngs. As indicated, the TOPAZ was put back into the water at Clear Lake repair yard in early May, and subsequently it was operated by either Jack or Robert Young on a number of pleasure and business entertainment excursions.[3] In fact, a total of almost 150 gallons of gasoline were purchased on several occasions for the operation of the TOPAZ during this period of approximately one month.[4] Also during this time it is undisputed that no gasoline leakage from any source was noted on the craft by either Jack or Robert Young. No test was ever made by plaintiff or any of the defendants herein for leakage in the gas tank, and, indeed, no need for such a test was ever evidenced prior to June 9, 1966.[5]

On June 9, while the TOPAZ was berthed at Boat Town Marina in Seabrook, Texas, plaintiff who was alone had parked his automobile within a few feet of the covered slip where the vessel was moored and prepared to go aboard.

1. Throughout this opinion, the occurrence will be variously referred to as an explosion and/or fire. The use of one term or the other is not intended as a specific finding that both actually occurred. While this Court does find that a fire occurred, the evidence does not clearly support an additional finding of an actual explosion, and, inasmuch as this is not critical to a resolution of the case, no such finding is made.

2. *See* plaintiff's exhibit 1, report of survey by Surveyor Jack Roberts. On page 3 of the report, the following recommendations are made:
 (A) Toilet be secured in place, through hull fitting for intake be reseated and hose clamp be replaced; (B) Fire extinguisher be located at wheel and at afterdeck while refinishing vessel; (C) Broken frame knee on starboard side be replaced or sistered; (D) Deck drain flanges on transom be reseated and missing screws be replaced; (E) Battery be secured in place and frayed cable be (G) Fuel and vent line be secured in replaced; (F) Tachometer cable be replaced and water pump be overhauled; place and broken band on tank be replaced with chaffing pad between tank and band; (H) Keel be scarphed in where split and keel bolts be replaced where bent and damaged; (I) Shaft bearing be replaced, shaft straightened and propeller be reconditioned. Rudder is fractured and should be replaced.

3. Also subsequent to the completion of Clear Lake's work, from May 7, 1966, to the date of the fire on June 9, 1966, Jack and Robert Young performed various miscellaneous repairs on the TOPAZ.

4. *See* plaintiff's exhibit 32, receipts for the purchase of gas at Boat Town on several occasions totaling 147.5 gallons, and testimony of Robert Young (cross-examination by Mr. Kratochvil), that fuel consumption of the vessel's single engine was believed to be approximately six gallons per hour. Assuming the accuracy of such estimate, this indicates some 25 hours of operation of the TOPAZ, less the time necessary to consume the disputed quantity remaining in the tank after such operations.

5. Testimony of Robert Young.

He immediately smelled strong gasoline fumes coming from the TOPAZ. He boarded the vessel, and shortly thereafter the explosion occurred. It is the sequence of events which took place between the time plaintiff went aboard and the time of the explosion that constitutes one of several major areas of sharp dispute in this lawsuit.

## A.

### SOURCE OF THE SPARK

There is considerable testimony that plaintiff opened the engine hatch, determined that the fumes were coming from the TOPAZ, and then went forward into the cabin and switched on the electric blower and the electric bilge pump, with the explosion and fire immediately following. This is the plaintiff's story. Additionally, after he initially smelled gas fumes and actually heard gasoline leaking, it is his version that he reached down into the engine compartment and felt gasoline dripping from the gas tank. Then, either unaware or unmindful of the possible consequences, he proceeded to turn on both the blower and the bilge pump in an effort to clear the TOPAZ of the combustible fumes which permeated the vicinity. A likely conclusion suggested by this account would be that the explosion or fire was caused by gasoline dripping from the tank which was ignited by an electrical spark from the energizing of either the blower or the bilge pump. There is, however, only the most speculative testimony in this case concerning the condition of the pump and blower, that is, whether or not they were operational, whether they were explosion proof, and whether the wires connecting this gear to their respective starter switches were in good condition.

A second theory as to the source of the spark was advanced and developed at the trial. There is evidence that plaintiff had planned to install a new voltage regulator in the engine compartment on the TOPAZ.[6] Plaintiff testified that the voltage regulator had been malfunctioning when he had used the boat on one or more occasions, that he had removed the cover from the voltage regulator on May 30, when he was last aboard the vessel prior to the date of the explosion and that the cover had never been replaced. He also testified that on June 9 he had brought a new voltage regulator with him in order to replace the faulty one. There is further evidence in the record from other witnesses to the effect that a voltage regulator was seen on the deck near the port side of the engine hatch on June 9, and that it was still there the following day.[7] However, plaintiff denied actually working on the voltage regulator on the day of the casualty and asserted that the voltage regulator was never taken from his car.

To lend credence to the theory that plaintiff set off the explosion by causing a spark while replacing the voltage regulator in the engine compartment, there is evidence in the record as to the nature of plaintiff's extensive injuries as well as evidence of probable location of the greatest concentration of flames on the boat. The most severe burns which plaintiff received were on his face, arms, shoulders, thighs and knees; that is, on the front portion of his body extending from his head to his knees.[8]

Testimony and exhibits further establish that the greatest concentration of flames emanated from the engine space which is located below the deck and reached through a hatch immediately aft of the cabin door. Mr. Cliff Williams, one of the persons who assisted in extinguishing the fire, testified that the main source of flames was from the engine hatch.[9] The plaintiff likewise indicated this to be a major source of fire, testifying that he tried to leave the cabin after starting the pump and blower and

6. Deposition of Robert Young at 42.

7. Deposition of Williams at 22–23; testimony of Surveyor Roberts.

8. Testimony of Robert Young on cross-examination by Mr. Ross; deposition of Williams at 28–29.

9. Deposition of Williams at 30.

# 1310

hearing the explosion, but was blocked by a "wall of flame" immediately outside the door.[10] In line with such testimony, plaintiff's expert, Mr. Lynn McWaters, a consulting chemical engineer and certified marine chemist, testified that the area most severely damaged by the fire was the starboard side of the engine compartment. There is further proof to the effect that, considering the relatively minor amount of burn damage shown to have occurred aboard the TOPAZ, although the initial burst of flame was of great intensity, the duration of the fire was very short.[11] The suggested conclusion which the defense urges should be reached from an analysis of this evidence is that the plaintiff was not in the cabin when the fire or explosion occurred, but was standing or squatting over the open engine hatch changing a voltage regulator and, while so occupied, he struck a spark in some manner which ignited the gasoline.[12]

## B.

### SOURCE OF THE FUEL

It is the plaintiff's thesis in this lawsuit that the source of gasoline which fueled the fire causing his injuries was the leaking gas tank on the TOPAZ which Surveyor Roberts and personnel at Clear Lake should have detected and corrected. The plaintiff's testimony that he felt gasoline dripping from the bottom of the gas tank shortly before the fire has been vigorously challenged by Surveyor Roberts who related that it is physically impossible for a person to reach or feel the bottom of the gas tank from a position on the deck. According to Roberts the only way such an examination of the tank could be made without removing the tank would be to lie prone in the bilges.

There is further testimony contradictory of plaintiff's version. Surveyor Roberts testified that his original survey of the TOPAZ including visual inspection of the gas tank and all attach-ments, during which he crawled into the bilges of the vessel and examined the bottom of the tank. He found no significant corrosion or damage to the tank which would evidence a leak, and, indeed, he found no leak. Both Surveyor Roberts and Mr. Gerald Holderby employed by Clear Lake testified that on or about June 13, some three or four days subsequent to the fire, they conducted a hydrostatic test of the gas tank in its cradle and still found no leakage. In order to make the test, they had to fill the remaining space in the tank with water which took approximately a half hour. A full tank of mixed gas and water remained after the test was performed.

The plaintiff's expert, Marine Surveyor Lynn McWaters, also looked into this aspect, and his testimony casts the record into a state of irreconcilable confusion. Although the written report of his findings was not offered into evidence, McWaters related that he examined the gas tank on board the TOPAZ on July 26, over six weeks after the casualty, and physically removed the tank from the vessel on August 2. He thereupon drained the tank which was approximately two-thirds full of gasoline, and transported it by truck to his testing laboratory in Houston where he filled it with water. Rust was then scraped from the outer surface of the tank, and a small leak appeared, indicating to McWaters that the interior of the tank had rusted or corroded.

If Mr. McWaters is to be believed, then other testimony at the trial is necessarily cast in jeopardy. The reverse is also true. Either no hydrostatic testing was done by Mr. Holderby and Surveyor Roberts on June 13, or at some time between June 13 and July 26, a quantity of gasoline found its way into the tank. Otherwise, it could not be two-thirds full of fuel when examined by Mr. McWaters. It is equally evident that plaintiff's own examination of the tank on June 9, the

10. Testimony of Robert Young on cross-examination by Mr. Ross.

11. Testimony of Dr. Gary Fisher.

12. Deposition of Williams at 27–31.

day of the fire, can only have been less than conclusive, if it is in truth physically impossible to touch the bottom of the tank from any position on the deck of the TOPAZ as indicated by the testimony of Surveyor Roberts. The Court is thus left with unchallenged evidence *only* that the tank did leak some six weeks *after* the explosion and fire, *after* it was removed from the TOPAZ, *after* it was hauled some miles in a pickup truck from LaPorte to the testing laboratory on Harrisburg Boulevard in Houston, and *after* it was filled with water and scraped.

Were it necessary to dissect each and every facet of asserted causation in order to resolve the issue of liability in this case, the multiple problems on credibility would be virtually insurmountable. Fortunately, when all of the proof is fairly assessed, it becomes evident that it is unnecessary to resolve the hotly disputed issue as to whether or not the gas tank leaked on June 9, 1966, the date of the fire. This is so because there is a significant intervening period of time after the Young brothers took delivery and assumed custody and control of the vessel from Clear Lake and the date of the casualty. By that date Robert and Jack Young had already been using the TOPAZ for over a month on business and pleasure cruises and had burned almost 150 gallons of gasoline in operating its single engine without any semblance of a leak in the gasoline tank or anywhere else on board. The critical point in time as concerns the liability of the various defendants thus becomes May 7, 1966, the date that the repair work of Clear Lake was accepted and possession and control of the TOPAZ returned to the plaintiff and his brother. Similarly, the tests and surveys conducted on the vessel at various times subsequent to the explosion and fire are also non-determinative, inasmuch as they fail to relate back to May 7 or even to June 9, 1966, the date of the fire.

As for other testimony at the trial, there is a dearth of persuasive evidence supportive of the size and nature of the leakage allegedly found by the plaintiff. From July 26 to August 2, six to seven weeks after the fire, there was little or no leakage from the gas tank. The small amount of change (one inch) in the level of gasoline in the tank was no more than that normally expected from evaporation or from a discrepancy in measuring or "sticking" the tank.[13] Surveyor Roberts, Mr. Holderby and Mr. Williams all testified that they smelled no gasoline fumes after the explosion and fire. On the other hand, Mr. Solomon testified that he could smell gas in the bilge of the TOPAZ some time subsequent to the explosion when he cleaned and washed the bilges, and Jack Young, the plaintiff's brother, testified that there were strong gas fumes present on the Saturday following the fire. Obviously, these versions cannot be reconciled, and the Court must look elsewhere in the proof.

Other factors militate in favor of little or no leakage from the gas tank which can be causally related to the casualty. The great weight of the evidence indicates a fire of short duration, a flash fire accompanied by a dull "thud" or "whoosh" rather than an actual explosion.[14] This account is supported by the fact that the TOPAZ was only slightly damaged by the fire.[15] The wooden cradle upon which the starboard side of the gas tank rested, and which lay directly under the section of the tank allegedly leaking, was virtually undamaged, as was the padding between the tank and cradle. Little scorching or blistering occurred on the painted surfaces of the vessel in the vicinity of the gas tank. The tank did not explode and showed no fire damage.[16] The cumulative effect of

13. Deposition of McLaughlin at 52–54.

14. Testimony of Robert Young.

15. Photographs, Plaintiff's exhibits 78 and 79.

16. Testimony of McWaters and Holderby.

this proof weighs heavily against the existence of a leak in the gas tank on June 9 or at any time prior thereto, particularly the existence of a leak of such size that gasoline could be heard or felt dripping beneath the tank.

Speculation as to the source of the fuel which was ignited is plentiful in the record of this case. Gasoline could have been deposited in the bilge of the TOPAZ as a consequence of spillage during refueling or perhaps by leakage or overflow from the dual carburetors, the latter being a common problem in the design and make of the particular engine installed on the TOPAZ.[17] Although leakage or overflow from the dual carburetors would provide only a very limited fuel source, perhaps a teacup full of gasoline, the presence of this small amount in a vaporous state and enclosed beneath the deck of the vessel is viewed as entirely consistent with the type of fire that occurred.[18]

A further complicating factor in determining the source of the fuel is created by testimony that the TOPAZ, similar to most Chris-Craft vessels of like design, normally lies afloat somewhat down by the head, that is, with the bow section of the vessel lower in the water than the stern.[19] Thus, assuming that there was gasoline floating on the water in the bilge, it is suggested that such water and gasoline could have passed through the limberholes in both the longitudinal frame (the keelson) and the transverse frames (the ribs), and thence toward the bow. The argument is made that this accounts for the presence of flames coming through the deck of the cabin and the amount of fire damage which resulted in the cabin. However, in all fairness this situation might also be urged to account for the presence of minimal damage in the vicinity of the gas tank, well astern of the cabin, even if the tank were thought to be leaking.

This Court finds itself confounded in its efforts to forge solid links in a chain of credible, consistent and conclusory proof as to how this casualty occurred.[20] However, it is not alone in this respect. Captain Eugene McLaughlin, a yacht broker and marine surveyor, testified that he could not determine the cause of the fire.[21] Surveyor Roberts testified similarly. Mr. Bill Jones, a yacht man of some 35 years experience and also a marine surveyor, testified that he could venture no opinion as to the cause of the fire. Mr. Gèrald Holderby, president and past general manager of Clear Lake Yacht Basin, ventured an opinion as to gasoline leakage or spillage from the dual carburetors of the TOPAZ, but he equivocated later in his testimony, stating that gasoline could have come from a number of places. Surveyor Lynn McWaters ventured an opinion that the

---

17. Testimony of Mr. Holderby.

18. But *see* plaintiff's exhibit 87, a speed memo from John Barnes of Wm. H. McGee & Co., dated June 10, 1966, reporting on Surveyor Roberts' post-explosion examination of the TOPAZ:
 Surveyor viewed boat today and reported all gasoline connections[,] fill lines and vents proper[;] however there was about 2″ of gasoline in bilge.

19. Testimony of Surveyor Roberts.

20. The record is replete with antithesis of which these are examples: The plaintiff testified that he leaned down from the deck to feel gasoline dripping from the tank; Surveyor Roberts stated that such an act is physically impossible. Three witnesses were sure they smelled no gasoline after the fire; two others did smell fumes around the same time. Cliff Williams could recall some five years later a voltage regulator and Delco-Remy box aboard the TOPAZ on June 9, 1966; Robert Young could recall never having taken the purchased voltage regulator on the TOPAZ. A hydrostatic test was performed on the gas tank by Surveyor Roberts and Mr. Holderby, about June 12, 1966, by filling the remaining space in the tank with water in an abortive effort to force gasoline out through the vent line; a full tank remained after the test; yet on August 2, 1966, Mr. McWaters again drained the same 45 gallon tank of 25 to 30 gallons of gasoline before performing a similar hydrostatic test which revealed a damp area on the tank.

21. Deposition of McLaughlin at 68.

spark could have emanated from the fathometer cable, which was heavily burned, but he agreed that other sources were also present.

When all is said and done including the careful weighing of the credibility of the witnesses in this case, the conclusion to be reached is that the plaintiff simply has not met his burden of proof. He has failed to demonstrate by a preponderance of the evidence that the alleged derelictions of one or more defendants contributed to cause the fire and explosion; instead, a record has emerged from this trial which is replete with confusion and contradiction. Under these circumstances, this Court, therefore, does not feel warranted in selecting any one of the various theories of causation brought out in the testimony, as none fairly stands up under scrutiny. To the contrary, certain other evidentiary matters are clear and can be reliably used in reaching a result.

The Court does find that the explosion and fire were proximately caused by some act, event or condition initiated by the plaintiff while the vessel was in his exclusive control and possession.[22] The Court does find that the gasoline tank did not leak on or before May 7, 1966, at which time the plaintiff and/or the Company inspected and accepted the repair work performed by Clear Lake, and took possession of the TOPAZ. On the basis of the testimony of the plaintiff himself and his brother the Court does find that the gasoline tank did not leak while in their possession and under their control after May 7 and before June 9, 1966. However, this Court does not make a finding as to whether the gasoline tank leaked on the date of the fire, June 9, 1966, and, indeed, it is unnecessary to do so in order to resolve this case. The absence of further findings of fact as to the source of the fuel is not determinative of this suit, inasmuch as recovery against all defendants must necessarily be denied, even assuming, *arguendo*, that all facts occurring on the date of the casualty and thereafter were found exactly as alleged by plaintiff.

II.

## THE NEGLIGENCE OF THE PLAINTIFF

If, it is assumed, *arguendo*, that the plaintiff, in fact, did no work on the voltage regulator or any other wiring on the TOPAZ, and it is further assumed, as plaintiff alleges, that the spark was caused by some defect in the wiring or switches of the bilge pump or blower, plaintiff's actions were so patently wrong that this Court must conclude his own negligence proximately caused the explosion and fire. No reasonably prudent man acting under the same or similar circumstances, that is, a man boarding a vessel absolutely reeking with the odor of gasoline, and then hearing and feeling gasoline drip from the gas tank, would proceed to activate any electrical apparatus. This is so, even if the electrical gear was in perfect working order, given the attendant and foreseeable risk of generating a spark from such equipment which could ignite the heavy concentration of gas fumes, *cf.* In re Reading, 169 F.Supp. 165 (N.D.N.Y.1958), aff'd, Reading v. Beaudin, 271 F.2d 959 (2d Cir. 1959). Plaintiff's own testimony reflects beyond question that he knew and fully appreciated the danger of explosion or fire before he pulled the switches to activate the electric blower and the electric bilge pump.

22. Plaintiff has repeatedly tried to establish some legal connection between Clear Lake Yacht Basin and Boat Town Marina, to support his contention (1) that Boat Town conducted or should have conducted periodic checks on all vessels berthed at that facility and (2) that Clear Lake is responsible for the failure of the Boat Town attendant to discover gasoline fumes on June 9, 1966. The Court finds, on the evidence presented, that the two were separate business entities (testimony of Mr. Holderby), and that in any event the TOPAZ was in the possession and control of the Youngs, rather than the Boat Town personnel. .

## III.

## THE REASONS FOR NON-LIABILITY OF THE DEFENDANTS

Notwithstanding plaintiff's failure to prove by a preponderance the causative facts of the explosion and fire, and irrespective of this Court's conclusion that plaintiff's negligence was the proximate cause of the occurrence, there are other strong factors which preclude the directing of a recovery in favor of plaintiff against any of the defendants in this case. Normally, under such circumstances, the Court would go no further in making its findings. However, since the opinions and conclusions arrived at are the composite result of plaintiff's inability to meet his burden of persuasion as well as the result of affirmative findings distilled from the other evidence including the making of credibility choices, where necessary, this Court feels obligated to rule as well on the specific theories of liability advanced by the plaintiff against the various defendants.

### A.

### CLEAR LAKE YACHT BASIN, INC.

■■ Plaintiff alleges that, in making repairs to the TOPAZ, Clear Lake warranted that the TOPAZ, including the gas tank, was reasonably fit for the purpose for which it was intended, that it was free of defects and that this warranty was breached.

This Court cannot find that Clear Lake made any general warranty of fitness or freedom from defect, either express or implied. First, Clear Lake was *not* hired to survey the vessel and make all repairs necessary to place such vessel in a seaworthy condition. Clear Lake was hired to make certain specific repairs on the TOPAZ, as listed in the survey report of Surveyor Roberts and as supplemented by independent requests for certain hull repairs by the Company or the Young brothers, cited *supra*. Not included in the specific work order and not authorized or ordered separately were testing, repair or replacement of the gas tank. Even assuming, *arguendo*, that

some duty devolved upon the repairman to advise the owner of the TOPAZ that the gas tank was leaking or would probably leak, the evidence established, and this Court so finds, that the gas tank was not leaking while in the possession and control of Clear Lake. Nor was the tank in such a deteriorated condition that normally careful observation would indicate a defect likely to occur in the future. Plaintiff's own testimony is that he never requested or authorized any work to be done on the gas tank, nor did he ever have any reason to suspect that such work should be done prior to the date of the explosion. No witness testified to the presence of gasoline fumes or leaks prior to June 9, more than thirty days after the TOPAZ left Clear Lake's facilities on May 7. The fire occurred approximately a month after the second examination of the vessel by Surveyor Roberts, after acceptance by the Young brothers and the Company of all repairs done by Clear Lake and after repeated use of the vessel by one or both of them for various pleasure and business excursions. The vessel was and had been for sometime under the exclusive control and possession of the Company and the Young brothers. Under the evidence presented at the trial of this case, there is no legally sound way for this Court to find that any defect in the TOPAZ or her appurtenances that might have existed on or after June 9, 1966, also existed on or before May 7, 1966, or that any such defect should have been discovered by Clear Lake. *Cf.* The Wheeler-Shipyard Hull No. 304, 1 F. Supp. 402 (E.D.N.Y.1932).

■ If it is assumed, as this Court believes it must, that no traceable defect in the TOPAZ existed for Clear Lake to discover and repair, then it must necessarily follow that Clear Lake cannot be held liable to the plaintiff. However, it is also a general rule that an independent contractor such as Clear Lake cannot be held liable for injuries resulting from defects traceable to such contractor's failure to satisfactorily complete his repairs, once the owner of the vessel has accepted

the work and taken possession and the defect is observable to the owner upon a reasonable inspection. *See* Hartford v. Coolidge-Locher Co., 314 S.W.2d 445 (Tex.Civ.App.—San Antonio 1958, no writ), 27 Am.Jur.2d, Independent Contractors § 49 (1968). Although this theoretical alternative is not factually relevant here, the legal result is the same. Clear Lake can have no liability to the plaintiff on a warranty or a negligence theory.

■■ Lastly, the claims allegedly by plaintiff against Clear Lake based upon the warranty of seaworthiness are legally invalid, inasmuch as the warranty is (1) a nondelegable duty of the shipowner, and is (2) extended only to *seamen* and those shore-based workers who perform work traditionally done by seamen, Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). Clear Lake is not the vessel owner and does not stand in the position of any other who owes the warranty such as an owner pro hac vice; the plaintiff is not a seaman and, upon the evidence before this Court, cannot be said to be engaged in work traditionally performed by seamen. The TOPAZ was a private pleasure craft. It was used in such a manner at all times material to this suit, and it did not have a crew. Although it was manned by either Robert or Jack Young or both, whenever it was operated, their "sporadic contacts for brief periods of time" aboard the TOPAZ fall far short of meeting the criteria established to place them in a position to enjoy the status of seamen, Labit v. Carey Salt Co., 421 F.2d 1333 (5th Cir. 1970); Offshore Co. v. Robison, 266 F.2d 769 (5th Cir. 1959) and cases cited therein.

These findings by the Court resolve the question of whether the warranty of seaworthiness is owed by *any* defendant to the plaintiff herein, since the plaintiff simply cannot qualify to be characterized as falling within the class of persons protected by such a warranty. That being so, it is unnecessary to resolve the question of ownership of the yacht TOPAZ as it relates to the issue of seaworthiness.

### B.

### SECURITY INSURANCE COMPANY OF NEW HAVEN

■ A policy of insurance was issued to Jack A. Young by Wm. H. McGee & Co. which is the general agent and marine manager in Texas for Security Insurance Co. of New Haven. Under the provisions of this policy written on a Security Pleasure Purpose Yacht Form, the hull of the TOPAZ was insured for $2,600 and the Protection and Indemnity Insurance coverage insured Jack Young against liability for loss of life and bodily injury, with coverage as to any one person limited to $50,000.

Plaintiff contends that the issuance by McGee of Security's insurance policy constituted an express or implied warranty by Security that the TOPAZ was reasonably fit as a yacht and was therefore seaworthy for all purposes. This contention is overly broad and obscures the true legal relationship. An underwriter, by requesting and receiving a condition and valuation survey as well as a report that survey recommendations had been met, and by issuing a policy on the vessel predicated upon such survey information, can be said to have admitted seaworthiness of the yacht for insurance purposes. In short, the vessel is found to be insurable by the insuror vis-a-vis the insured pursuant to policy conditions. However, these acts of the underwriter do not constitute any warranty of seaworthiness analogous to that owed by a shipowner to seamen or any other category of person including the plaintiff who may see fit to fashion such a remedy.

■ Inasmuch as Security can therefore only be liable under the policy to the extent that its assured, Jack Young, is liable, his status requires examination. For reasons discussed in detail in section C, *infra*, this Court finds that Jack Young is not liable to the plaintiff under

any theory advanced in this lawsuit. Accordingly, Security has no liability to plaintiff under the policy in question as a consequence of the activities or status of Jack Young.

No contention has been made that Security committed any tort, either negligent or intentional, whether by misfeasance or nonfeasance. It has been urged, however, that Surveyor Roberts, in performing his survey, acted as an agent of Security, that he was negligent and that his negligence should be imputed to Security. This Court finds from the evidence, however, that Surveyor Roberts was not an agent of Security and that he was, instead, an independent contractor, engaged either by Jack Young or Robert Young to perform a condition and valuation survey for insurance and appraisal purposes. Robert Young testified that Surveyor Roberts was recommended by Mr. Ralph Zinnecker, Assistant Manager of Clear Lake, to make the survey. Jack Young testified that Billy Gilbert, then employed by Wm. H. McGee & Co., recommended Surveyor Roberts.[23] Assuming, *arguendo*, that Mr. Gilbert of Wm. H. McGee & Co. did recommend Roberts from an approved list of marine surveyors, this Court can only conclude that Surveyor Roberts was actually *hired* by the insured, Jack Young,[24] and was not in any legal sense an agent of Security.

One of the prime elements necessary to establish an agency relationship is "the existence of some degree of control by the principal over the conduct and activities of the agent," 3 Am.Jur. 2d, Agency, § 2 (1962). Courts have construed this rule to mean that, even though a principal employs another to achieve a certain result, if the principal has no right of control over the manner and method by which that result is reached, then the negligence of the actor is not imputed to the principal, Walter

Irvin, Inc. v. Vogel, 158 S.W.2d 93 (Tex. Civ.App.—Amarillo 1942, writ ref'd w. o. m.); Restatement of the Law Second: Agency § 250 at 549 (1958). *Cf.* Newspapers, Inc. v. Love, 380 S.W.2d 582 (Tex.Sup.1964). In the instant case, there was merely a recommendation made by an employee of Wm. H. McGee & Co. that Surveyor Roberts would be a competent marine surveyor. Security Insurance Co. did not hire Surveyor Roberts and did not pay his fee;[25] it had no right to, and, in fact did not, exercise any control over the manner and mode of Roberts' performance of the survey. Similarly, Wm. H. McGee & Co., through which Security acted, is an independent contractor over which Security exercises no control. This is particularly so in connection with marine insurance matters in which McGee acts as insurance manager, rather than agent for Security. Security, therefore, is not chargeable with the liability for any of McGee's actions.

Contrary to another of plaintiff's contentions, and irrespective of the actual ownership of the yacht TOPAZ, Security is not liable under its policy issued to Jack Young for any duties owed to the plaintiff by Young Furniture Mfg. Co. It is Jack Young, individually, and not the Company that is the assured. There is testimony to the effect that Wm. H. McGee would not have written insurance for a corporation on a Yacht Form in return for a pleasure purpose premium rate, since the potential liabilities of the corporation were much greater than those in situations where an individual is concerned.[26] In short, a larger premium would have been charged to the corporate client. This Court cannot find any basis in the record justifying reformation of the policy so as to obligate Security to insure the Company, absent a showing that the named assured was so designated as a

---

23. *See also* deposition of Billy Gilbert at 18.

24. Testimony of Surveyor Roberts; *see* deposition of Billy Gilbert at 67–68.

25. It was agreed that McGee would pay Surveyor Roberts' fee if McGee wrote insurance coverage on the TOPAZ.

26. Testimony of John Barnes.

matter of mutual mistake, particularly since reformation in this case would extend the risks covered by the insurer without any consideration for such an extension, J. Appleman, 4A Insurance Law & Practice § 2914 at 649 (1969). *See also,* J. Appleman, 13 Insurance Law & Practice § 7618 at 390–91 (1943).

 Finally, this Court finds that Robert Young compromised and settled his claim for personal injuries resulting from the explosion and fire aboard the TOPAZ by his endorsement of Wm. H. McGee & Co.'s settlement draft in the amount of one thousand dollars, which draft reads:

> being in full payment and satisfaction of all claims and demands for loss, damage or expense for: All losses and/or personal injuries sustained from fire and/or explosion of subject vessel.

His acceptance of the same in a case such as this where liability is disputed, notwithstanding the attempt to vary the terms of the draft by unilaterally marking through certain portions of the material quoted, *supra,*[27] operates as a bar to further claims on the assured or his insurer, Groves v. Sawyer, 384 S.W.2d 193 (Tex.Civ.App.—Eastland 1964, writ ref'd n. r. e.).

## C.

## JACK A. YOUNG AND YOUNG FURNITURE MANUFACTURING CO.

Plaintiff alleges that either Jack Young or the Company is the owner of the TOPAZ, and that the party found to be the owner by the Court is liable to plaintiff for breach of the warranty to furnish a seaworthy vessel. Plaintiff further contends that if Jack Young is found to own the TOPAZ, then the Company should be construed to occupy the position of bareboat charterer or owner pro hac vice. This Court has already discussed and ruled on the question of the doctrine of seaworthiness and its inapplicability to this plaintiff for reasons independent of any ownership question, section A, *supra.* Such discussion and ruling are dispositive of the issue.

 No allegations have been made that Jack Young was negligent, and no evidence has been presented which could support such an allegation. This Court therefore finds that Jack Young has breached no duties owed to the plaintiff, nor has he in any manner contributed to plaintiff's injuries.

 It is contended that Young Furniture Mfg. Co., Inc. owed a duty to the plaintiff to furnish him a safe place to work as he cleaned and serviced the TOPAZ in preparation for the entertaining of clients of the Company. If any such legal duties are theoretically owed to seamen or land-based marine workers by the Company under the facts of this case, they are clearly inapplicable to the plaintiff who does not qualify under either category. The only possible relationship between the Company and the plaintiff, a company executive officer, which is conceivably productive of such a duty is that of employer-employee, breach of which is compensable under the Texas Workmen's Compensation Act. The pre-trial order and the final judgment of the state court[28] filed in this case establish that plaintiff made a claim in state court against the compensation carrier for Young Furniture Mfg. Co., his employer, which claim was settled during the trial thereof, but before the issue had gone to the jury.[29] This recovery, accepted as a full and final settlement, precludes any further recovery by the plaintiff from the Company, Huckabay v. Hughes Tool Co., 122 S.W.2d 233

---

27. *See* defendant Security's exhibit 1.

28. Defendant Clear Lake's exhibit 4.

29. Plaintiff recovered in settlement the total sum of $32,500 less attorney's fees, of which Utica Mutual Insurance Company paid $16,500, and J. R. Martin, Jr., Robinson & Company, and All Risk Insurance Agency, jointly and severally, paid $16,000. Intervenors in this lawsuit are subrogated insurors, and have intervened in an effort to recover such payments out of any judgment awarded to the plaintiff.

(Tex.Civ.App.—Galveston 1938, writ dism'd); see Lotspeich v. Chance Vought Aircraft, 369 S.W.2d 705 (Tex.Civ.App. —Dallas 1963, writ ref'd n. r. e.). Furthermore, this Court finds that the Company was not negligent and that it in no way contributed to the plaintiff's injuries.

### D.

### SURVEYOR JACK ROBERTS

■ Although this Court has already treated and dismissed the contention of plaintiff that an agency relationship exists between Security and Surveyor Roberts out of which the liability of either party to plaintiff ensues, there remains for consideration plaintiff's alleged cause of action against Roberts individually. Specifically, plaintiff contends that both the initial marine survey of the TOPAZ and the re-examination and report prepared subsequent to the completion of vessel repairs by Clear Lake constituted an express or implied warranty by Roberts that the TOPAZ would be reasonably fit for the purpose for which it was intended when all recommended repairs had been completed.

As was the situation in the case of Clear Lake, it is impossible from the record of the trial of this case to find that Surveyor Roberts' actions were a proximate cause of plaintiff's injuries. The negligence of the plaintiff, the intervening period of time subsequent to the completion of repairs and relinquishment of custody by Clear Lake, the use for pleasure to which the vessel was put by the Young brothers during such time plus a total lack of proof in a confused record as to causal facts linking this marine surveyor to the casualty compel this Court to find no liability against this defendant.

Although liability cannot be affixed against Surveyor Roberts under the facts of this case, the relationship of a marine surveyor to the growing numbers of people owning pleasure boats is worthy of note. As in any profession calling for the exercise of judgment and expertise, there are no rigid guidelines for marine surveyors covering all situations. Yet common sense as well as the law dictate that there is a level of performance below which a surveyor cannot go and escape exposure to liability where, contrary to the present case, such performance can be proven to be causally related to the casualty.

Surveyor Roberts is a marine surveyor of some eighteen years experience, much of his work being in the pleasure craft field. His testimony in this case reflects that the type of marine survey which is performed in a given instance varies greatly with the situation. For example, a vessel which was being purchased would normally be given a thorough examination, and a survey report setting out in detail all defects and potential hazards would be issued. On the other hand, a survey for insurance purposes on a vessel already purchased by the person requesting the survey would be, by comparison, rather limited in scope and duration.[30] The survey conducted on the TOPAZ was of the latter variety, taking some three hours from start to finish including travel time which was estimated to be 1½ to 2 hours. Recognizing that this Court has found no causal relationship between Surveyor Roberts' actions and this plaintiff's accident, the question might well be asked by a layman as to whether a thorough survey could be made upon a vessel of the size, age and condition of the TOPAZ in the space of an hour to an hour and a half.

Surveyor Roberts further testified that of the three to five marine surveyors in this area who specialize in a yacht practice, most conform to the same standards which he himself seeks to apply to his surveys, namely the National Fire Protection Association release no. 302 (1966).[31] Although no specific provi-

---

30. Direct testimony of Surveyor Roberts when called as a witness for defendants.

31. Plaintiff's exhibit 123.

sions contained in this manual were alluded to at the trial, it is obvious from a review of this exhibit that the Fire Protection Standard for Motor Craft is a high one:

The purpose of this Standard is to provide guidance for the prevention of fuel leakage, the elimination of possible sources of vapor ignition from particularly dangerous locations, the provision of adequate means for keeping vital areas ventilated at all times, the avoidance of unnecessary use of combustible materials in exposed locations and the provision of proper fire extinguishing equipment.

(Introduction, plaintiff's Exhibit 123).

A marine surveyor, particularly one who engages in the burgeoning pleasure boat field where the majority of boat owners are not educated and experienced mariners, performs an indispensable service, often a life-saving service, to his clientele. Whether the survey be conducted for insurance purposes or for the purchase or sale of a vessel, this examination may be, in all likelihood, the only one made by an experienced hand. The landlocked public perhaps can rely on workmen to inspect and repair most major household appliances and not be placed in jeopardy of serious injury or death, at least in the majority of instances, in the event that the repairman inspects in a cursory manner or performs substandard work. But reliance by laymen on such skilled professionals as marine surveyors to inspect and advise as to pleasure boats with their sophisticated machinery, high powered engines and other gear must be said to be of a different caliber, one of which the law must take cognizance in a proper case. "There are few other uses of petroleum fuels by the public in which the fire and explosion hazards parallel those possible in motor craft." [32]

## IV.

The Court having found against the plaintiff and for the defendants on the liability issues, it becomes unnecessary to explore and pass upon the issues of damages and intervention. The above constitute this Court's Findings of Fact and Conclusions of Law. Counsel will submit within twenty (20) days a proposed Order consistent with this Memorandum. Clerk will notify counsel.

---

32. Introduction, plaintiff's exhibit 123.